IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 2025 Session

**IN RE GABBY G.**

**Appeal from the Juvenile Court for Franklin County**
**No. 23-JV-90        Gerald L. Ewell, Jr., Judge**
_____

**No. M2024-00541-COA-R3-JV**
_____

This is a case involving three individuals who all claim entitlement to time with a child: the child's mother, the child's biological father, and the mother's former husband who believed himself to be the child's biological parent for the majority of her life. After the mother disclosed the child's parentage to both men, the biological father filed a petition to be named the child's parent and for a parenting plan to be established. The mother agreed with his petition in all respects. But the mother's former husband soon intervened with a petition to be awarded stepparent visitation pursuant to Tennessee Code Annotated section 36-6-303. Following the filing of the stepparent visitation petition, the mother and the biological father, who at this point had never had any unsupervised or overnight visitation with the child, executed an agreed parenting plan in which they would share joint custody and equal parenting time with the child, as well as waive child support. After a joint hearing on both petitions, the trial court adopted the mother and biological father's proposed parenting plan, except that the former husband was granted stepparent visitation with the child every other weekend and over the summer holiday; the former husband's weekend visitation only occurred during the time that the proposed plan would have allotted to the mother. The mother now appeals this decision. We affirm in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Vacated in Part, and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Allison Renfro, Murfreesboro, Tennessee, for the appellant, Savannah L.G.

Joseph C. Johnson, Fayetteville, Tennessee, for the appellee, Christopher H.

- 1 -

Mark Stewart, Winchester, Tennessee, for the appellee, Chad W.G.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

On August 1, 2023, Petitioner/Appellee Christopher H. ("Biological Father") filed a petition to establish parentage in the Franklin County Juvenile Court ("the trial court") against Respondent/Appellant Savannah L.G. ("Mother") and Respondent/Appellee Chad W.G. ("Stepfather").[1] There, Biological Father alleged that Mother gave birth to a child, Gabby G., in September 2016. According to the complaint, Mother and Stepfather were together at that time and later married in 2018; Stepfather was named the child's parent on her birth certificate. By the time of Mother and Stepfather's divorce, however, they acknowledged that Stepfather was not the biological parent of the child. Still, in the 2021 permanent parenting plan that resulted from the divorce, Mother and Stepfather agreed not to inform the child of her parentage until her eighteenth birthday and that Stepfather would continue to act as the child's father. They therefore entered into a permanent parenting plan in which Stepfather was ordered to pay child support and exercised parenting time every other weekend, on holidays, and in the summer.

The petition further alleged that in June 2023, Mother informed Biological Father that he was the parent of Gabby, which was confirmed by genetic testing in July 2023. Biological Father therefore asked that he be declared the natural father of the child and that a permanent parenting plan be adopted setting forth his rights and responsibilities as it relates to the minor child. Biological Father also asked that the child's last name be changed to his and that "any rights [Stepfather] may have to said minor child be terminated."

Mother answered the petition on August 3, 2023, admitting all of the allegations and that Biological Father was entitled to the relief he requested. Later, Biological Father filed a motion to prevent Stepfather from exercising any visitation with the child. The trial court granted the motion the same day only to the extent that Stepfather and his agents were prohibited from discussing the parentage action with the child.

After a motion for default judgment was filed against him, Stepfather filed an answer on September 8, 2023, admitting many of the factual allegations of the petition but denying that his visitation with the child should be terminated. On the same day, Stepfather filed a petition for stepparent visitation pursuant to Tennessee Code Annotated section 36-6-303.[2] Therein, Stepfather alleged that he had acted as Gabby's parent for her entire life

---

[1] In cases originating in juvenile court, we refer to the parties by their first names and last initials to protect the anonymity of the children involved.

[2] Technically, the petition was a cross-complaint against fellow respondent Mother and a

- 2 -

and was therefore entitled to visitation under the statute. Moreover, Stepfather asserted that he was entitled to reimbursement for child support and other payments made to Mother following the divorce.

Mother answered Stepfather's petition on October 16, 2023, denying that this was the type of extraordinary case in which stepparent visitation should be granted and asserting that visitation would interfere with the child's relationship with herself and Biological Father. Mother also denied that Stepfather was entitled to reimbursement for any payments he voluntarily undertook in the divorce action.

On November 14, 2023, the trial court appointed a guardian ad litem for the child. A hearing on the competing petitions was held on December 1, 2023. Among the witnesses were Biological Father, Mother, and Stepfather; the child was permitted to testify in camera.

Mother and Biological Father testified about the child's conception and how he came to know about the child's existence. Mother explained that the child was conceived while Mother and Stepfather were on a short "break" and that neither questioned that Stepfather was the child's biological parent until many years later.[3] Indeed, Biological Father did not know of the child's existence until 2023. According to Mother and Biological Father, Mother sent him a Facebook message in 2020 to contact her.[4] Mother admitted that at this time, her relationship with Stepfather was "going downhill" and "rocky," but no divorce had yet been filed. But Biological Father never saw that message. Then Mother and Biological Father saw each in a grocery store in June or July 2023, and Mother directed Biological Father to check his messages.[5] He did so, and they set up an in-person meeting, at which point Mother informed Biological Father of the child's parentage. The parties then underwent paternity testing that confirmed that Biological Father was the child's biological parent. At some point, Biological Father started paying some expenses for the child.[6]

Since that testing, Mother has permitted the child to see Biological Father on some occasions for a few hours at a time. During one meeting, Mother informed the child about her parentage, despite her agreement in the divorce not to do so. Both Mother and Biological Father testified that the visits have been exceedingly positive. At the time of

---

counfercomplaint against petitioner Biological Father.
    [3] Mother explained that she only began to question the child's parentage due to her lack of physical resemblance to Stepfather.
    [4] Mother testified that she could not find Biological Father's contact information prior to this time.
    [5] Mother admitted that this "chance" meeting occurred after contempt proceedings had been filed in the post-divorce action related to issues with visitation with Stepfather. According to Stepfather, he objected to Mother allowing the child to be supervised by Mother's other minor child.
    [6] Pursuant to the parenting plan still in place relative to the divorce, Stepfather was also paying these expenses.

trial, however, Biological Father's visits had not exceeded a few hours and had never been unsupervised; as such, the child had not yet had any overnight visitation with Biological Father. Regardless, it was disclosed during trial that on October 23, 2023, Mother and Biological Father entered into an agreed proposed parenting plan that would award joint custody of the child to Mother and Biological Father, with each having 182.5 days with the child. This parenting plan, which was submitted to the trial court, further stated that child support would be waived.[7]

Mother and Biological Father explained that they attempted to prepare the child for the conversation about her parentage in an age-appropriate manner.[8] Biological Father also stated that he believed that the child would need therapy as a result of this matter. He therefore looked into therapy for the child but had not engaged a therapist because he has not yet been granted the right to make decisions for the child; Mother testified that she left any effort to obtain therapy for the child to Biological Father.

Both Mother and Biological Father testified that their goal was to completely terminate any visitation between the child and Stepfather. According to Biological Father, he did not want Stepfather to have visitation with the child because Stepfather kept the truth of the child's parentage from both Biological Father and the child, which Biological Father deemed to have been an act of "selfishness" and "fraud" rather than love for the child. Biological Father admitted that Stepfather set up a meeting with him to come to an agreement where both men could be in Gabby's life, but he denied that Stepfather should have any contact with the child. Mother testified that she wanted to terminate Stepfather's relationship with the child because a continuing relationship with Stepfather would prevent the child from bonding with Biological Father. But she admitted that terminating the relationship with Stepfather would have "some kind of effect" on the child and that the cessation of the relationship should be gradual.

There was no dispute that Stepfather acted as the child's parent for essentially the entirety of her life. According to Stepfather, the relationship is very close, as in a typical parent-child relationship. Stepfather was awarded every-other-weekend visitation in the divorce, which he testified was ideal due to Mother's work schedule.[9] Stepfather explained that he exercises his visitation at his parents' farm in Stevenson, Alabama,[10] but that he

---

[7] The proposed parenting plan contains this agreement on a separately paginated page that includes a space for both parties to sign. Neither signed on this page, but only at the conclusion of the parenting plan.

[8] Specifically, Mother testified that Biological Father did all of the research in preparation for the disclosure and that she simply trusted his approach.

[9] Stepfather testified that prior to the divorce being finalized, Mother permitted him to have visitation with the child every weekend, but that Mother later only permitted Stepfather to have every-other-weekend visitation after they "got into arguments or whatever[.]" Stepfather further testified that for a nine-week period prior to the entry of the divorce decree, Mother prevented him from having any contact with the child.

[10] Mother and Stepfather resided with Gabby in Stevenson for a period of time during their

recently purchased a camper to place on his property in Winchester, Tennessee, and plans to build a permanent home there. The testimony indicated that the child is very close to not only Stepfather, but also his extended family, who have always and continue to treat the child as their relative. Stepfather further testified that it would hurt Gabby "tremendously" if their time together was suspended.

Stepfather testified that he believes that Biological Father is a "good man," that it was in the child's best interest to develop a relationship with Biological Father, and that he will be helpful in facilitating that relationship. As Stepfather explained, Gabby is

> a daddy's girl. And even though she may not show much love and affection to everybody else, she does me. And I don't want her to think that I am ever going to be walking out of her life. But if I can hold her hand and go to [Biological Father] and say, you know, you're not losing me; you're just gaining somebody else, you know, and us all love her. I believe I can help her out.

The child's testimony indicates that she is angry at Mother for lying to her about her father.[11] She also has no bond with Biological Father and characterized him solely as her horse-riding instructor. Gabby explained that a picture taken of her hugging Biological Father was only taken because Mother told her to. She unequivocally stated that she wanted to continue to have visitation with only Mother and Stepfather, who she views as her father.

The trial court entered an order on March 22, 2024, and an amended order on March 25, 2024. Due to issues of finality, a second amended order was entered on September 11, 2024. The second amended order is the operative order for purposes of this appeal, and we will refer to this order exclusively in this Opinion.

The trial court first considered the request for stepparent visitation filed by Stepfather. The trial court found that Mother and Biological Father oppose Stepfather's visitation and want to eventually terminate any visitation between Stepfather and the child. The trial court further made detailed factual findings in support of its conclusion that given the significant existing relationship between Stepfather and the child, there was a danger of substantial mental, emotional, or physical harm if Stepfather's visitation was not granted. The trial court then considered each of the relevant best interest factors in the stepparent visitation statute before concluding that it was in the child's best interest for Stepfather to be awarded ongoing visitation.

Thus, the trial court adopted Mother and Biological Father's proposed parenting plan, except that Stepfather was awarded visitation every other weekend from Thursday at

---

marriage.

[11] Mother testified that this anger only occurred after the child visited with Stepfather.

7:00 pm to Sunday at 7:00 pm. This resulted in Stepfather's visitation always overlapping with Mother's weekend visitation such that she was not awarded any weekend visitation during the school year. But the trial court found this schedule would not significantly reduce Mother's time with the child, as she admitted that she chose to work on weekends. Stepfather was also awarded one seven-day period in the summer during a week that he would have had a weekend. As a result, Biological Father was awarded 50% of the time with the child, Mother was awarded roughly 29% of the time with the child, and Stepfather was awarded roughly 21% of the time with the child. The trial court made no findings as to child support other than adopting the proposed plan that waived child support. Finally, the trial court ruled that Stepfather waived or abandoned his claim for reimbursement of support and expenses, and that he would not be awarded attorney's fees in this action. From this order, Mother now appeals.[12]

## II. ISSUES PRESENTED

Mother presents the following issues for review, which are taken from her appellate brief:

1. Whether the trial court erred by failing to provide findings of fact and conclusions of law as required by Tenn. R. Civ. P. 52.01 regarding the "best interest" factors as required by Tenn. Code Ann. § 36-6-106, and whether a material change of circumstances has occurred, in a residential schedule modification action?
2. Whether the trial court erred by failing to apply the child support guidelines, failing to make written findings that the application of the guidelines would be unjust or inappropriate in this case in order to provide for the best interests of the child, and failing to provide a justification for the variance from the guidelines, as required by Tenn. Code Ann. § 36-5-101(e)(1)(A)?
3. Whether the trial court abused its discretion by awarding an unreasonable amount of stepparent visitation?
4. Whether Mother should be awarded her reasonable attorney's fees for this appeal?[13]

---

[12] We still have some concern that the trial court's order is non-final. In particular, in his petition, Biological Father asked that the child's last name be changed. Although it appears that Mother admitted that Biological Father was entitled to this relief, the trial court did not explicitly address this request in any of its orders. While it is true that this Court typically has subject matter jurisdiction over final judgments only, we have discretion to waive this rule for good cause. *See Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 559 (Tenn. 1990) (citing Tenn. R. App. P. 2). In this case, given the nature of custody decisions affecting minor children and our determination that further proceedings must take place in this matter, we exercise our discretion to review the issues in this appeal notwithstanding the possible outstanding issue concerning the child's name change.

[13] Mother also raised an issue arguing that the trial court erred in awarding stepparent visitation under the statute at all. As noted, *infra*, Mother abandoned this issue at oral argument.

Both Biological Father and Stepfather assert that the trial court's decision was correct in all respects as it relates to the issues involving them.

## III. STANDARD OF REVIEW

In an appeal of a case involving child custody and parenting plans, the scope of our review is limited. *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017). Certainly, we continue to review the trial court's legal conclusions de novo and its factual findings "de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013) (citing Tenn. R. App. P. 13(d)).

We recognize, however, that "trial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans." *C.W.H.*, 538 S.W.3d at 495 (citing *Armbrister*, 414 S.W.3d at 693). As a result, "determining the details of parenting plans is peculiarly within the broad discretion of the trial judge" and we will "not overturn a trial court's decision merely because reasonable minds could reach a different conclusion." *Id.* (citations and internal quotation marks omitted). A trial court's decision regarding a parenting schedule is therefore reviewed only for an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court applies "an incorrect standard, reaches an illogical conclusion, resolves the case on a clearly erroneous assessment of the evidence or relied on reasoning that causes an injustice." *Armbrister*, 414 S.W.3d at 693. We will only reverse a trial court's custody decision "when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence." *C.W.H.*, 538 S.W.3d at 495 (citations omitted). When the trial court's ruling rests on the credibility of the witnesses before it, we afford considerable deference to the trial court's findings because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

## IV. ANALYSIS

### A.

Mother's first issue is two-fold. First, she asserts that the trial court was required to find that a material change in circumstances occurred before entering a new parenting plan. Second, she asserts that the trial court erred in failing to make findings of fact and conclusions of law as to the best interest factors under Tennessee Code Annotated section 36-6-106 in adopting the permanent parenting plan in this case.

It is well settled that "[a] custody decision, once final, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*,

No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing **Young v. Smith**, 193 Tenn. 480, 246 S.W.2d 93, 95 (Tenn. 1952)); *see also* **Steen v. Steen**, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001); **Solima v. Solima**, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998). However, because children's and parents' circumstances change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." **Scofield**, 2007 WL 624351, at *2. In particular, Tennessee Code Annotated section 36-6-101(a)(2)(B) provides that

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

If the court finds that a material change in circumstances has occurred, then "the court must proceed to the second step of the analysis to determine whether the modification sought is in the child's best interest." **Canada v. Canada**, No. W2014-02005-COA-R3-CV, 2015 WL 5178839, at *4 (Tenn. Ct. App. Sept. 4, 2015).

Respectfully, we do not agree with Mother that the trial court committed error in this regard. As an initial matter, we note that the material change in circumstances requirement is based on the principles of res judicata. *See* **Armbrister**, 414 S.W.3d at 698–99 (explaining the origin of the material change in circumstances concept as resulting from the court's recognition that existing parenting orders are res judicata on the facts as they existed at the time of the entry of the order); *see also* **Scofield**, 2007 WL 624351, at *3; **Ellis v. Carucci**, 123 Nev. 145, 161 P.3d 239, 243 (Nev. 2007) (recognizing that the concept of material change in circumstances derived from the doctrine of res judicata and was intended to prevent litigants dissatisfied with custody decrees from filing immediate, repetitive, serial motions in the hope of achieving a different result, based on essentially the same facts). But res judicata only "precludes a subsequent lawsuit 'between the same parties, or their privies, on the same claim with respect to all issues which were, or could have been, litigated in the former lawsuit.'" **Armbrister**, 414 S.W.3d at 689 n.15 (quoting **Jackson v. Smith**, 387 S.W.3d 486, 491 (Tenn. 2012)). Biological Father was not a party to the divorce action in which the permanent parenting plan between Mother and Stepfather was created. This is the initial action between Mother and Biological Father, not an effort to modify an existing plan between them. As such, res judicata is simply not applicable.

Moreover, even if we were to assume, arguendo, that the material change in circumstances concept was applicable here, it is absurd to suggest that the introduction of a previously unknown man to the child as her father with whom Mother has agreed she

will now spend substantial parenting time is not a material change in circumstances affecting the child's best interest. And in any event, Mother admitted in her answer to Biological Father's petition that a new parenting plan should be established giving him parenting time with the child. *Cf.* Tenn. Code Ann. § 36-6-405(d) ("If the parties agree to a modification of an existing permanent parenting plan, and the parties announce to the court and place on the record an agreement specifying the terms of modification, . . . then the court is not required to inquire further[.]").

Mother next asserts that regardless of whether the trial court was required to find a material change in circumstances, it erred in failing to make findings of fact and conclusions of law as to the best interest factors contained in Tennessee Code Annotated section 36-6-106(a). *See* Tenn. Code Ann. § 36-2-311(a)(9), (10) (stating that upon establishing parentage, the trial court "shall" determine both custody and parenting time with the child "pursuant to chapter 6 of this title"); Tenn. Code Ann. § 36-6-106(a) (stating that the best interest factors apply to any "proceeding requiring the court to make a custody determination regarding a minor child"); Tenn. Code Ann. § 36-6-404(b) (stating that the best interest factors typically apply to decisions regarding residential schedules in parenting plans). Without these findings, Mother asserts that the trial court's parenting plan must be vacated and remanded. *See **Flynn v. Stephenson***, No. E2019-00095-COA-R3-JV, 2019 WL 4072105 (Tenn. Ct. App. Aug. 29, 2019) (holding that because the trial court failed to make findings of fact and conclusions of law concerning the best interest factors as required by Rule 52.01 of the Tennessee Rules of Civil Procedure, the parenting plan was vacated and remanded for further proceedings).

On appeal, however, Biological Father argues that that the trial court was excused from making written findings of fact and conclusions of law regarding the relevant best interest factors by Tennessee Code Annotated section 36-6-101(a)(2)(A)(i), which states, in relevant part, as follows:

> Unless both parents have agreed to a custody arrangement and parenting plan, orders for custody arrangements must include written findings of fact and conclusions of law to support the basis for the order. Unless the court finds by clear and convincing evidence to the contrary, there is a presumption that joint custody is in the best interest of a minor child where the parents have agreed to joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child.

Tenn. Code Ann. § 36-6-101(a)(2)(A)(i).[14]

---

[14] This first sentence of the quoted language was adopted by the Tennessee General Assembly in 2021. *See* 2021 Tenn. Laws Pub. Ch. 311 (H.B. 237). The parties have cited no cases that have applied this language since its enactment.

Mother does not dispute that she entered into a proposed parenting plan with Biological Father that provided for joint custody over the child. Moreover, Mother filed no reply brief and therefore offered no specific argument against the application of section 36-6-101(a)(2)(A)(i) to this case. Still, the clear implication of Mother's argument on appeal is that the trial court did not give proper consideration to the question of custody and parenting time between Mother and Biological Father, as its findings focused exclusively on Stepfather's request for stepparent visitation. *See generally* **DiNovo v. Binkley**, 706 S.W.3d 334, 336 (Tenn. 2025) (holding that in construing appellate briefs, Tennessee courts must "enhance, not impede, the search for justice"); **Trezevant v. Trezevant**, 696 S.W.3d 527, 531 (Tenn. 2024) ("[W]hen the arguments set forth in an appellate brief fall within the scope of the stated issues, and the issues and argument taken together clearly present the grounds for appellate relief, the reviewing court should review the substantive issues."); **Chiozza v. Chiozza**, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) (noting that deficiencies in a party's appellate briefing are more likely to be overlooked "in cases involving domestic relations where the interests of children are involved"). And this Court has a duty "to apply the controlling law for which there is a basis in the record, whether or not cited or relied upon by the parties." **Kocher v. Bearden**, 546 S.W.3d 78, 85 n.8 (Tenn. Ct. App. 2017) (quoting **Coffee v. Peterbilt of Nashville, Inc.**, 795 S.W.2d 656, 658 n.1 (Tenn. 1990)).

To be sure, this is a unique case. Rather than the typical custody dispute in which two parties are vying for time with a child, here, Gabby's time will be split between three people.[15] It is true that Mother entered into a proposed parenting plan in which she and Biological Father would share joint custody but their agreement failed to account for Stepfather's visitation. Thus, the arrangement contemplated in the agreement—182.5 days of parenting time each—is simply not possible where some time must be set aside for Stepfather's visitation. Certainly, it cannot be said that Mother agreed to the ultimate arrangement established by the trial court in which she was awarded less than 30% of the time with the child and no weekend visitation during the school year. As such, it is arguable that this case does not fall within the narrow category of circumstances in which the Tennessee General Assembly has seen fit to dispense with the requirement that the trial court make written findings of fact and conclusions of law in support of its decision, i.e., where "both parents have agreed to a custody arrangement *and parenting plan*[.]" Tenn. Code Ann. § 36-6-101(a)(2)(A)(i) (emphasis added); *see also* **Bailey v. Bailey**, No. M2022-01467-COA-R3-CV, 2025 WL 1517411, at *17 (Tenn. Ct. App. May 28, 2025) (vacating the trial court's parenting plan and custody determination where the order modifying the parties' agreed-upon temporary parenting plan "briefly discussed most of the best interest factors" but only in "broad generalities" and failed to include an explicit finding that the

---

[15] Although Mother initially argued in her brief that Stepfather did not meet his burden to prove his entitlement to stepparent visitation, Mother now concedes on appeal that Stepfather established the elements of stepparent visitation and that the only question is whether the amount of visitation awarded by the trial court was excessive or unreasonable.

modified arrangement was in the child's best interest).

Even more importantly, Mother and Biological Father's agreement did not obviate the need for the trial court to consider the child's best interest before entering a parenting plan in this case. Instead, this Court has long held that "[a]lthough parties may agree to a given parenting arrangement, such an agreement does not obviate the trial court's duty to ensure that it is in the children's best interests." **Stricklin v. Stricklin**, 490 S.W.3d 8, 18 (Tenn. Ct. App. 2015); *see also **In re Baby***, 447 S.W.3d 807, 828 (Tenn. 2014) ("Our prior decisions establish that when courts are required by statute to make a determination based on the best interests of a child, the parties cannot use a private agreement to relieve the court of its obligation to conduct an independent inquiry. . . . Any agreement that purports to settle the question of a child's best interests is not binding on the court." (citation omitted)). Although section 36-6-101(a)(2)(A)(i) was amended in 2021 to add the provision excusing the trial court from making findings of fact and conclusions of law "to support the basis for the order" in some circumstances, nothing in that amendment excuses the trial court from its well-settled duty to determine the child's best interest.[16]

Moreover, "[i]f practicable, a statute is to be construed so that its component parts are reasonably consistent." **In re C.K.G.**, 173 S.W.3d 714, 722 (Tenn. 2005). "Every word used is presumed to have meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature." **Id.** The first sentence of section 36-6-101(a)(2)(A)(i) provides that the trial court "shall have the widest discretion to order a custody arrangement that is in the best interest of the child." The statute also gives the trial court authority to deviate from an agreement for joint custody if it finds clear and convincing evidence that such an arrangement would not be in the child's best interest. **Id.** Additionally, we have held that even if the parties agree to joint custody, the trial court is not required to enter a parenting plan that is identical to the one proposed by the parties. *See **Holmes v. Holmes***, No. E2013-01301-COA-R3-CV, 2014 WL 408464, at *6 (Tenn. Ct. App. Feb. 3, 2014) (holding that the trial court did not err when the parties agreed to an alternative-week joint custody schedule and the trial court adopted a different plan that still constituted a form of joint custody but was not "exact equality"). Construed as whole and giving meaning to all parts of the statute, the only reasonable construction of section 36-6-101(a)(2)(A)(i) is that the trial court is not stripped of its authority to consider the best interests of a child notwithstanding the agreement of the parents. *Cf. **Najo Equip. Leasing, LLC v. Comm'r of Revenue***, 477 S.W.3d 763, 769 (Tenn. Ct. App. 2015) ("The court's interpretation must not render any part of the statute inoperative, superfluous, void or insignificant." (internal quotation marks and citation omitted)). Thus, while the 2021 amendment to section 36-6-101(a)(2)(A)(i) may excuse the trial court from making written findings of fact and conclusions of law to support its decision when the parties agree to a custody arrangement and parenting plan, it must still independently consider the child's

---

[16] Importantly, the presumption in favor of joint custody absent clear and convincing evidence was enshrined in Tennessee law at the time of the decisions in **Stricklin** and **In re Baby**.

- 11 -

best interest prior to adopting that plan.

Our review of the trial court's order suggests that the trial court failed to fully consider Gabby's best interest when it adopted the proposed parenting plan as it relates to the time allotted to Mother and Biological Father. *Cf. Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014) ("[T]he record must not create doubt that the decision represents the trial court's own deliberations and decision."). As an initial matter, the trial court's written order contains no express finding that either the parenting plan between Mother and Biological Father or the ultimate custody and parenting time arrangement ordered by the court were in Gabby's best interest. This does not end our inquiry, however, as we view a trial court's order not only for what is expressly stated, but also what is clearly implied. *Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013). Indeed, in some cases, we have held that by simply adopting an agreed parenting plan, we can presume that the trial court in fact considered the best interests of the children involved. *See In re D.M.H.*, No. W2006-00270-COA-R3-JV, 2006 WL 3216306, at *11 (Tenn. Ct. App. Nov. 8, 2006) ("We must presume that . . . the judge considered the best interests of the children.").

In this case, however, the trial court's order leads us to believe that the trial court did not give enough consideration to the question of Gabby's best interest as it relates to the parenting arrangement between Mother and Biological Father. For example, compared to the question of stepparent visitation, the trial court made few findings in support of its allocation of parenting time between Mother and Biological Father. The trial court noted that Mother and Biological Father had entered into a proposed parenting plan giving them equal time with the child. And the trial court remarked that "there was very little, if any, focus of the proof on the factors in T.C.A. 36-6-106 as to the parental sharing decision between [Mother] and [Biological Father]." The trial court then simply adopted the parenting plan proposed by Mother and Father with the amendment that Stepfather would be granted visitation, all of which would be deducted from Mother's parenting time. As a result, Biological Father, the individual with the least historical contact with the child, was granted more parenting time than Mother, who was undisputedly the child's primary parent for her entire life.

But this "decision" to grant Biological Father so much time does not align with either the evidence or the trial court's other findings. Importantly, the proof demonstrated that Biological Father had never had anything other than a few hours of visitation with the child where Mother was also present. The trial court also found that Biological Father's focus was not on the child's best interest, but only on "his rights" to his biological child to the exclusion of Stepfather.[17] Likewise, the trial court appeared to question Biological Father's willingness to facilitate a relationship with Stepfather should visitation be granted,

---

[17] Of course, the trial court made similar findings against Mother, noting that her "behavior has few positive attributes."

- 12 -

citing Biological Father's "extreme animosity" toward Stepfather.[18] So the trial court awarded the most parenting time to the individual with the least contact with the child, who the trial court viewed as showing little concern for the child's best interest and unlikely to facilitate a relationship with an individual whose removal from Gabby's life the trial court found would cause her substantial harm. Given the trial court's misgivings, it appears that the trial court concluded that it was bound by Mother and Biological Father's agreement in this case and was without authority to depart from their agreed arrangement, except to the extent that it was ordering stepparent visitation. Respectfully, this was error. *See Fletcher v. Fletcher*, No. M2010-01777-COA-R3-CV, 2011 WL 4447903, at \*10 (Tenn. Ct. App. Sept. 26, 2011) (holding that "the trial judge, and the trial judge alone, has the solemn duty to determine whether a given parenting arrangement is in the best interest of a child").

We recognize that many of the purported errors of which Mother complains in this appeal are the product of her own making. It was her choice to agree not to inform Gabby of her parentage, only to break that promise when it was convenient for her.[19] It was also her choice to align herself with Biological Father during these proceedings, only to have that decision result in her parenting time being substantially decreased.[20] Indeed, half of the errors Mother asserts on appeal essentially contend that the trial court did not do more to save Mother from her own missteps. Only now, in this appeal, does Mother assert that in giving her what she asked for, the trial court erred. Often, this court is reluctant to correct an error that a party had a hand in causing. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). However, we do not wield custody and parenting time decisions as weapons to punish parents for their poor decision-making. *See Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973) ("It is correct that the placement of custody should not be used solely to punish a parent for misconduct; however, misconduct does frequently reflect upon relative fitness or unfitness for custody; and, to this degree and for this purpose, misconduct of parents may properly be considered in the determination of custody."). And it is the court's responsibility to protect the interests of minor children where necessary to do substantial justice. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not . . . assigned as error on appeal."). Here, the question is whether the trial court adopted the Mother's and Biological Father's proposal without undertaking the important task of first determining the child's best interest. Having thoroughly reviewed the trial court's order,

---

[18] To the extent that Biological Father testified that he would facilitate that relationship, the trial court suggested that this testimony was the result of coaching from his attorney.

[19] The trial court did not credit Mother's testimony concerning how she made contact with Biological Father in 2023.

[20] And Biological Father now appears aligned with Stepfather in this appeal, as both argue that the trial court's ruling should be affirmed in full.

we must conclude that the record fails to reflect that the trial court fulfilled its necessary role. So the parenting plan entered by the trial court must be vacated and remanded to determine the child's best interest.

**B.**

Mother next asserts that the trial court erred in failing to apply the child support guidelines in this case. In determining child support, there is a rebuttable presumption that child support should be awarded in accordance with the Tennessee Child Support Guidelines. Tenn. Code Ann. § 36-5-101(e)(1)(A); *see also* Tenn. Comp. R. & Regs. 1240-02-04-.01 (stating that the Child Support Guidelines apply in all cases to establish modify or enforce child support). If, however, "the court finds that evidence is sufficient to rebut this presumption, the court shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child or children, or the equity between the parties." Tenn. Code Ann. § 36-5-101(e)(1)(A). Where the trial court orders a deviation, the trial court "shall state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines." ***Id.***; *see also* Tenn. Comp. R. & Regs. 1240-02-04-.07(1)(c) ("The tribunal may order as a deviation an amount of support different from the amount of the presumptive child support order if the deviation complies with the requirements of this paragraph (1) and with this chapter. The amount or method of such deviation is within the discretion of the tribunal provided, however, the tribunal must state in its order the basis for the deviation and the amount the child support order would have been without the deviation.").

In this case, it appears that the trial court merely adopted Mother and Biological Father's proposed parenting plan that stated only that "[b]oth parents agree that neither will have to pay child support for time is equal." The trial court made no other findings as to child support. Biological Father does not dispute that the trial court made no findings in support of its child support order but argues that Mother waived consideration of this issue because she did not raise child support in the trial court. We respectfully disagree.

Here, while Biological Father's petition to establish parentage did not expressly mention child support, it did ask that he "be afforded all rights, privileges *and obligations* as the natural father of [the] child." (Emphasis added). One of the obligations of parenthood in Tennessee is the duty to support your minor children. *See generally* Tenn. Code Ann. § 34-1-102(b). Moreover, the parentage action specifically states that an order establishing parentage "shall include the following: . . . [a] [d]etermination of child support pursuant to chapter 5 of this title." Tenn. Code Ann. § 36-2-311(a)(11)(A). Thus, child support was clearly at issue in this case.

But the fact that the parties agreed to waive support does not defeat Mother's argument. Indeed, Tennessee has long held that child support may not be waived and that the parties' agreement to waive support is not binding on the court. *See, e.g.,* ***Jones v.***

***Crum***, No. E2006-02420-COA-R3-CV, 2007 WL 1574282, at \*4–5 (Tenn. Ct. App. May 31, 2007) ("[A]greements, incorporated in court decrees or otherwise, which relieve a natural or adoptive parent of his or her obligation to provide child support are void as against public policy as established by the General Assembly." (quoting ***Witt v. Witt***, 929 S.W.2d 360, 363 (Tenn. Ct. App. 1996))). Instead, the Child Support Guidelines specifically state that:

> (i) If the parties stipulate to the child support to be paid for the support of the parties' children, the stipulations, whether in a marital dissolution agreement, parenting plan, or in any other document establishing the amounts to be paid for the support of the parties' children, shall be reviewed by the tribunal before approval.

> (ii) No hearing shall be required as to the amount of child support awarded in such cases. However, the tribunal shall use the Guidelines in reviewing the adequacy of child support obligations negotiated by the parties, including provisions for medical care, and, if the negotiated agreement does not comply with the Guidelines or contain the findings of fact necessary to support a deviation, the tribunal shall reject the agreement.

> (iii) In such stipulations, the order approving the agreement or parenting plan or other document:

> (I) Shall establish a specific numerical dollar figure for support to be paid at specified intervals (weekly, biweekly, semimonthly, monthly). The final child support order shall not be expressed as a percentage of the parent's income.

> (II) If the agreement does not state the amount of support calculated under the Guidelines, the order of the tribunal approving the agreement shall state the amount of support proposed in the agreement and the guideline amount and shall provide in writing:

> I. The reasons the tribunal deviated from the presumptive amount of child support that would have been paid pursuant to the Guidelines;

> II. The amount of child support that would have been required under the Guidelines if the presumptive amount had not been rebutted; and

> III. A finding by the tribunal that states how, in its determination,

> A. Application of the Guidelines would be unjust or inappropriate in the particular case before the tribunal; and

> B. The best interests of the child or children who are subject to the support award determination are served by deviation from the presumptive guideline amount.

- 15 -

Tenn. Comp. R. & Regs. 1240-2-4-.01(2)(b)(1).

Here, nothing in the record indicates that the trial court independently reviewed the parties' agreement to determine if it complied with the Child Support Guidelines or followed the procedure prescribed by Regulation 1240-2-4-.01(2)(b)(1). There is no finding of what the presumptive amount of support would be, that it would be inappropriate to apply the guidelines to this case, or that a deviation is in the child's best interest. Moreover, given our decision to vacate the parenting plan, the presumptive amount of support may be different upon remand. This very well may be one of the atypical cases in which a deviation from the presumptive amount of child support is warranted. But the trial court failed to make the required findings to support a deviation in this case. As such, the trial court's decision to waive child support is vacated, and this matter is remanded to the trial court for further proceedings in compliance with the above law.[21]

## C.

In her brief to this Court, Mother's raised two arguments as to the award of stepparent visitation. First, she argued that the trial court did not apply the proper standard in determining that the child would suffer substantial harm if visitation was not awarded. She also argued that the trial court awarded an excessive amount of visitation. At oral argument, however, Mother conceded that stepparent visitation was appropriate in this case and argued only that the stepparent visitation that was ordered was unreasonable or excessive.[22] Although we confine our review to that issue, a review of the stepparent visitation statute is helpful to our analysis.

In 2019, the Tennessee General Assembly amended Tennessee Code Annotated section 36-6-303 to provide a framework for awarding stepparent visitation "[i]n extraordinary cases[.]" Tenn. Code Ann. § 36-6-303(a)(1).[23] The statute contains multiple requirements that must be met for stepparent visitation to be awarded.

---

[21] We note that very little evidence in support of the child support question was presented at the trial. Moreover, the circumstances of the parties may have changed. The trial court may consider the present circumstances of the parties upon remand.

[22] A panel-member clarified Mother's position during her rebuttal at oral argument, asking, "There is no question, you agree, stepparent visitation's appropriate?" Mother's attorney replied, "Yes."

[23] Prior to 2019, the statute merely stated as follows:

(a) In a suit for annulment, divorce or separate maintenance where one (1) party is a stepparent to a minor child born to the other party, such stepparent may be granted reasonable visitation rights to such child during the child's minority by the court of competent jurisdiction upon a finding that such visitation rights would be in the best interests of the minor child and that such stepparent is actually providing or contributing towards the support of such child.

(b) Such decree shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case require.

Tenn. Code Ann. § 36-6-303 (2018).

First, the statute indicates that the court shall hold a hearing on a petition for stepparent visitation "if such visitation is opposed by a parent or custodian or if the petitioner's visitation has been severely reduced by the parent or custodian" and one of the listed circumstances are present. *Id.* In this case, there is no dispute that Mother and Biological Father oppose Stepfather's visitation and one of the circumstances—that Mother and Stepfather are divorced—is present. Tenn. Code Ann. § 36-6-303(a)(1)(B).

The statute goes on to state that the next requirement is "the presence of a danger of substantial mental, emotional, or physical harm to the child if the requested visitation is not permitted by the court." Tenn. Code Ann. § 36-6-303(b)(1). According to the statute,

> Such finding of substantial harm may be based upon cessation or severe reduction of the contact between a minor child and the petitioner only if the court determines by a preponderance of the evidence that the child had a significant existing relationship with the petitioner, and that loss of or severe reduction in contact is likely to occasion severe mental, emotional, or physical harm to the child or presents the danger of other direct and substantial harm to the child.

*Id.* But the petitioning stepparent "is not required to present the testimony of an expert witness in order to establish a significant existing relationship with a child or that the loss or severe reduction of the contact is likely to cause substantial mental, emotional, or physical harm to the child." Tenn. Code Ann. § 36-6-303(b)(2). However, "[t]here is a rebuttable presumption that a fit parent's or custodian's actions and decisions regarding the petitioner's requested visitation are not harmful to the child's mental, emotional, or physical health." Tenn. Code Ann. § 36-6-303(c). Therefore, "[t]he burden is on the petitioner to prove that a parent's or custodian's actions and decisions regarding visitation will cause substantial harm to the child's mental, emotional, or physical health." *Id.* If the trial court finds that the petitioning stepparent has shown the presence of substantial harm, then the court is required to consider whether the visitation would be in the best interest of the child. Tenn. Code Ann. § 36-6-303(c).

In making this determination, the trial court is directed to consider the following non-exclusive factors:

> (1) The length and quality of the prior relationship between the child and the petitioner and the role performed by the petitioner;
>
> (2) The existing emotional ties of the child to the petitioner;
>
> (3) The preference of the child if the child is determined to be of sufficient maturity to express a preference;

(4) The effect of hostility between the petitioner and the parent or custodian of the child manifested before the child, and the willingness of the petitioner, except in case of abuse, to encourage a close relationship between the child and the parent or custodian of the child;

(5) The good faith of the petitioner in filing the petition or motion;

(6) If one (1) parent or custodian is deceased or missing, the fact that the petitioner requesting visitation is or was the spouse of the deceased or missing parent or custodian;

(7) Any unreasonable deprivation of the petitioner's opportunity to visit with the child by the child's parent or custodian;

(8) Whether the petitioner is seeking to maintain a significant existing relationship with the child;

(9) Whether awarding the petitioner visitation would interfere with the parent-child relationship or the custodian-child relationship;

(10) The child's interactions and interrelationships with siblings, half-siblings, other relatives, and step-relatives;

(11) Any court finding that the child's parent or custodian is unfit; and

(12) Any other factors the court deems relevant.

Tenn. Code Ann. § 36-6-303(e). If these factors demonstrate that visitation is in the child's best interest, "reasonable visitation may be ordered." Tenn. Code Ann. § 36-6-303(d). Like other visitation questions, this Court reviews the trial court's decision as to the amount of visitation awarded to a non-parent under the abuse of discretion standard. *See* **Rose v. Malone**, No. M2021-00569-COA-R3-CV, 2022 WL 2914644, at *13 (Tenn. Ct. App. July 25, 2022) (involving grandparent visitation).

Here, the trial court made extensive findings in support of its conclusions that the substantial harm element had been met and that the best interest factors supported the award of visitation. In particular, the trial court noted that Stepfather and the child had a long-standing loving relationship that was based on their mutual belief for many years that Stepfather was the child's biological parent. The trial court also noted that the child is bonded to Stepfather's extended family, who continue to love the child and wish to spend time with her. In contrast, the trial court characterized the actions of Mother and Biological Father as not focused on the child's best interest but their own interests. The trial court in particular took issue with Mother's actions, which it characterized as manipulative. The evidence also indicated that the child would likely suffer harm if Stepfather was not permitted a relationship with her. Moreover, the trial court found that the child expressed a strong desire to continue a relationship with Stepfather. But despite this fact, both Mother and Biological Father testified that their goal was to eventually terminate any relationship

between Stepfather and the child. It was therefore clear from the trial court's order that it believed that the only individual putting the child's interest first in this case was Stepfather. Thus, the trial court's findings that the child would suffer substantial harm if visitation was not granted and that visitation was in the child's best interest are fully supported by the evidence in the record. We therefore affirm the trial court's decision to award Stepfather visitation under section 36-6-303.

Mother asserts, however, that even though visitation was warranted under the stepparent visitation statute, the trial court awarded Stepfather an excessive or unreasonable amount of visitation. In particular, she notes that as the result of the trial court's order, she was awarded only approximately 29% of the time with the child, as all of Stepfather's visitation was deducted from Mother's parenting time.

No cases have specifically addressed a question regarding the amount of visitation that should be awarded pursuant to the stepparent visitation statute.[24] In support of her argument, Mother therefore relies heavily on the law developed with regard to Tennessee's grandparent visitation statute. For one, she asserts that like in the grandparent visitation context, the stepparent visitation statute should not be viewed as placing parents and stepparents on "equal footing," as only the parent has fundamental constitutional rights at stake. *Uselton v. Walton*, No. M2012-02333-COA-R3-CV, 2013 WL 3227608, at *11 (Tenn. Ct. App. June 21, 2013) (citation omitted). Thus, Mother asserts that this case "is not a contest between equals." *Id.* (citation omitted). As this Court previously explained in the context of grandparent visitation:

> Once . . . the court determines that visitation is in the child's best interest . . . . the court is tasked with creating a visitation plan that advances the state's compelling interest in minimizing harm to the child. *See* Tenn. Code Ann. § 36-6-306(c). However, because parental rights are fundamental rights, the plan must be narrowly tailored to achieve the state's objective. *See City of Memphis v. Hargett*, 414 S.W.3d 88, 102 (Tenn. 2013). Therefore, a "reasonable" grandparent visitation plan is one that is "carefully crafted both to afford grandparents the visitation necessary to avoid substantial harm to the child and to minimize, to the extent possible, interference with the parent-child relationship." *Lovlace v. Copely*, 418 S.W.3d 1, 31 (Tenn. 2013) (emphasis added).

*In re Diawn B.*, No. M2017-01159-COA-R3-JV, 2018 WL 3530838, at *3–4 (Tenn. Ct. App. July 23, 2018). As a result, "the trial court may not 'start with the standard for an action between a child's parents as the baseline and tweak it . . . for . . . grandparent visitation.'" *Id.* at *4 (alteration in original) (quoting *Uselton*, 2013 WL 3227608, at *11). Under this framework, this Court ruled that a trial court's decision to grant significant

---

[24] In fact, very few cases have ever considered questions regarding stepparent visitation and no cases have applied section 36-6-303 since its 2019 amendment.

grandparent visitation—every other weekend visitation, plus one week of summer vacation, Mother's Day, and the weekends before Thanksgiving and Christmas—was excessive under the circumstances despite the strong emotional tie between the child and the grandparent. *See Evans v. Derrick*, No. M2023-01550-COA-R3-JV, 2024 WL 4250190, at *7 (Tenn. Ct. App. Sept. 20, 2024).

According to Mother, the trial court made the same error in this case because it awarded Stepfather the same visitation that he had been awarded in the 2021 divorce action. Mother further contends that the visitation awarded was more extensive than necessary to maintain the relationship with Stepfather and instead interferes with her relationship with the child.

Although the cases involving grandparent visitation are helpful to our analysis given the fundamental parental rights at stake, all cases involving custody and visitation with children must be considered on a case-by-case basis. Indeed, "[t]he level of visitation necessary to minimize harm is dependent on the unique facts of each case." *In re Diawn B.*, 2018 WL 3530838, at *4 (citing *In re Dayton R.*, No. W2015-01848-COA-R3-JV, 2016 WL 1403255, at *7 (Tenn. Ct. App. Apr. 7, 2016)). Given our disposition of the parenting plan issue, *supra*, we conclude that the issue of Stepfather's visitation schedule should also be vacated and remanded for the trial court to consider Stepfather's visitation in conjunction with the parenting time awarded to Mother and Biological Father. Because Mother no longer disputes that Stepfather is entitled to visitation with the child, the only question to be decided under section 36-6-303 is the amount of visitation allotted to Stepfather and the schedule for such visitation.

**D.**

Finally, Mother asserts that she is entitled to an award of attorney's fees incurred on appeal pursuant to Tennessee Code Annotated section 36-5-103(c), which provides as follows:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

As our supreme court has explained,

> In cases involving the custody and support of children, it has long been the rule in this State that counsel fees incurred on behalf of minors may be recovered when shown to be reasonable and appropriate. Although there is no absolute right to such fees, their award in custody and support proceedings is familiar and almost commonplace. In awarding attorney's fees pursuant to

- 20 -

section 36-5-103(c), the trial court may consider proof of inability to pay, but such consideration will not be controlling.

*Taylor v. Fezell*, 158 S.W.3d 352, 360 (Tenn. 2005) (citations, quotation marks, and brackets omitted).

As Mother points out in her brief, the parties did not present proof as to the parties' incomes or ability to pay during the hearing in this case. Moreover, much of Mother's success in this appeal has been in spite of her own litigation strategy in the trial court, rather than a result of her efforts. Thus, we exercise our discretion to decline Mother's request to be awarded attorney's fees incurred on appeal.

## V. CONCLUSION

The judgment of the Franklin County Juvenile Court is affirmed in part and vacated in part. This cause is remanded to the trial court for further proceedings consistent with this Opinion. Because time has not stood still while this case was on appeal, the trial court may, in its discretion, consider new evidence regarding the parties' present circumstances upon remand as to all outstanding issues. Pending a final determination of the custody and visitation issues, the parenting plan and visitation schedule established by the trial court's September 11, 2024 order shall remain in effect, absent agreement of the parties or order of the trial court temporarily altering the plan. Costs of this appeal are taxed one-half to Appellant Savannah L.G., and one-half to Appellee Christopher H., for all of which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE